UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ANGELA HENDERSON
WILLIAMSON,

          Plaintiff,

   v.

TRAVELPORT, LP, et al,

          Defendants.

CIVIL ACTION NO.
1:17-CV-00406-JPB

## ORDER

This matter comes before the Court on Angela Henderson Williamson's

("Plaintiff") Motion for Judgment on the Administrative Record [Doc. 52] and

Travelport, LP and Galileo & Worldspan U.S. Legacy Pension Plan's

("Defendants") Cross Motion for Judgment on the Administrative Record [Doc.

53]. The Court finds as follows:

## I.    BACKGROUND

This case arises from the alleged denial of Plaintiff's pension benefits.

Plaintiff filed this action on February 1, 2017, under the Employment Retirement

Income Security Act ("ERISA"). [Doc. 1]. Plaintiff amended her complaint on

May 9, 2017, bringing claims for improperly withheld pension benefits, document-

disclosure penalties and breach of fiduciary duties. [Doc. 16]. On June 8, 2017,

Defendants moved to dismiss Plaintiff's Amended Complaint, and on June 22, 2017, Plaintiff filed a motion for oral argument to respond to the motion to dismiss. [Doc. 19]; [Doc. 21]. On January 11, 2018, the Court granted the motion to dismiss the action in its entirety and denied as moot Plaintiff's motion for oral argument. See Williamson v. Travelport, LP, 289 F. Supp. 3d 1305, 1322 (N.D. Ga. 2018). Plaintiff appealed on February 6, 2018. [Doc. 26]. On March 27, 2020, the Eleventh Circuit Court of Appeals affirmed the dismissal except for Plaintiff's claim for improperly withheld pension benefits, which was remanded to this Court for resolution on a full administrative record. See Williamson v. Travelport, LP, 953 F.3d 1278, 1299–1300 (11th Cir. 2020). Accordingly, the sole remaining claim before this Court is Plaintiff's cause of action for benefits under Section 502(a)(1)(B) of ERISA. See 29 U.S.C. § 1132(a)(1)(B).

Defendants filed the administrative record on April 30, 2021. [Doc. 51]. That same day, Plaintiff filed a Motion for Judgment on the Administrative Record pursuant to Rule 52 of the Federal Rules of Civil Procedure. [Doc. 52]. On May 28, 2021, Defendants filed a Cross Motion for Judgment on the Administrative Record under Rule 56. [Doc. 53]. Plaintiff requested oral argument on the pending motions, and the Court granted that request on March 7, 2022. [Doc. 58]. The Court held oral argument on May 9, 2022, [Doc. 68], and the parties

subsequently filed supplemental briefing, see [Doc. 69]; [Doc. 70].  The motions

are ripe for review.

In the ERISA context, motions for final judgment under Rule 52 and

motions for summary judgment under Rule 56 of the Federal Rules of Civil

Procedure serve as "'vehicles for teeing up ERISA cases for decision on the

administrative record.'"  Graham v. Life Ins. Co. of N. Am., 222 F. Supp. 3d 1129,

1137 (N.D. Ga. 2016) (quoting Stephanie C. v. Blue Cross Blue Shield of Mass.

HMO Blue, Inc., 813 F.3d 420, 425 n.2 (1st Cir. 2016)).  Therefore, "regardless of

the specific vehicle chosen, the standard of review—which requires the Court to

review the administrative record—remains the same."  Id.  This Court therefore

proceeds with a review of the administrative record.  In this posture, the Court

"does not take evidence, but, rather, evaluates the reasonableness of an

administrative determination in light of the record compiled before the plan

fiduciary."  Id. (quoting Curran v. Kemper Nat'l Servs., Inc., No. 04-14097, 2005

WL 894840, at *7 (11th Cir. Mar. 16, 2005)); see also Prelutsky v. Greater Ga.

Life Ins. Co., 692 F. App'x 969, 972 n.4 (11th Cir. 2017).

When deciding a motion for judgment on the administrative record, Federal

Rule of Civil Procedure 52(a)(1) requires the Court "to find the facts specially and

state its conclusions of law separately."  The Court derives its findings of fact and

conclusions of law from the administrative record that was available to the plan administrator when the administrator made the decision to deny benefits.  See Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008).

## II.   FINDINGS OF FACT

The Court's findings of fact are organized as follows:  (A) Plaintiff's Employment History and Plan Participation; (B) Relevant Plan Terms; (C) The Role of the Employee Benefit Committee (the "EBC"); and (D) Plaintiff's Claim for Benefits, Appeal and the EBC's Determinations.

### A.   Plaintiff's Employment History and Plan Participation

Plaintiff is a former employee of United Airlines ("UAL") and its various successor entities.  During and after the period of her employment, she participated in various retirement benefit plans, some of which are at issue now.

Plaintiff was employed by UAL from September 4, 1968, to June 30, 1988.  AR 907–08.[1]  During that time, Plaintiff participated in the UAL Plan.  See AR 204–326 (the UAL Plan).  On June 30, 1988, Plaintiff's employment was transferred to Covia, a successor entity to UAL.  AR 909.  From July 1, 1988, until

_____

[1] References to the administrative record omit the antecedent zeros.  For example, the Court cites "AR 000907" as "AR 907."  Additionally, for ease of reference and where applicable, the Court includes the document or plan name and plan section before a given citation to the administrative record.

December 31, 1992, Plaintiff worked for Covia and participated in the Covia
Pension Plan (the "Covia Plan").  Id.; see also AR 133–202 (the Covia Plan).  On
January 1, 1993, Covia replaced the Covia Plan with the Covia Employees Pension
Plan.[2]  AR 334.  On September 16, 1993, Covia and Apollo Travel Service
Partners merged to create Galileo International Partnership ("Galileo").  Id.  The
Covia Employees Pension Plan was thus renamed the Galileo International
Employees Pension Plan (the "Galileo Plan").  Id.; see also AR 1–127 (the Galileo
Plan).  From January 1, 1993, until May 6, 1997, Plaintiff was employed by
Galileo and participated in the Galileo Plan.  AR 909.  Plaintiff's employment
ended on May 6, 1997; her expected retirement date was December 1, 2011.  AR
909; AR 593.

Following another merger, on January 1, 2008, the Galileo Plan became the
"Galileo & Worldspan U.S. Legacy Pension Plan" (the "Legacy Plan" or the
"Plan"), which is the current, operative plan and is a defendant in the present case.
AR 334–35; see also AR 328–451 (the Legacy Plan).  The Legacy Plan designates
Travelport, also a named defendant, as the administrator of the Plan and assigns

---

[2] This replacement does not appear to have substantially changed the terms of the Covia
Plan.

Travelport all responsibilities for the Plan's administration unless a particular responsibility is delegated to the EBC.[3]  § 17.01, Legacy Plan, AR 388.

To summarize, Plaintiff participated in five plans, corresponding to the following approximate timeframes:  (1) the UAL Plan (1968–1988); (2) the Covia Plan (1988–1992); (3) the Covia Employees Pension Plan (January–September 1993); (4) the Galileo Plan (September 1993–1997); and (5) the Legacy Plan (2008–present).  However, not every plan is at issue here; instead, this case primarily concerns how Plaintiff's benefits are calculated under the Legacy Plan (number 5 in the list) and, specifically, how that plan accounts for her participation in the UAL Plan (number 1) and the Covia Plan (number 2).

**B.    Relevant Plan Terms**

In this section, the Court discusses plan provisions about eligibility for plan participation and the calculation of benefits.  As a general rule, the Court will

---

[3] More specifically, Section 17.01 of the Legacy Plan provides that

> The Company shall be the "administrator" of the Plan within the meaning of Section (3)(16)(A) of ERISA and Section 414(g) of the [Internal Revenue] Code and the named fiduciary of the Plan under Section 402 of ERISA.  The administration of the Plan shall be the responsibility of the Company except to the extent such responsibilities are delegated to the [EBC].

AR 388.  The Legacy Plan elsewhere defines the "Company" to mean Travelport.  See § 2.13A, Legacy Plan, AR 339.

begin with the terms of the operative plan—the Legacy Plan—before addressing language contained in earlier plans, as necessary.

### 1.    Eligibility for Participation

A "Participant" in the Legacy Plan is an Employee[4] "who has satisfied the eligibility requirements set forth in . . . this Plan and has commenced participation in the Plan, but only as long as such individual either remains an Employee or is entitled to benefits payable under the Plan."  § 2.38, Legacy Plan, AR 345.  The eligibility requirements of the Legacy Plan are that an Employee reaches the age of twenty-one and completes one Year of Service.  § 3.01, Legacy Plan, AR 349.  A "Year of Service" is defined as, for the "purposes of eligibility to participate in the Plan," "each year of employment in the United States with an Employer . . . that begins on an Employee's Employment Date and each anniversary thereof, and ends on [her] Severance from Service Date."  § 2.58, Legacy Plan, AR 349.  The Legacy Plan also provides that "[p]articipation in the [Covia Plan] or the [UAL

---

[4] The Legacy Plan defines "Employee" as "[a]ny person who, on or after January 1, 1997, is receiving remuneration for personal services rendered to the Employer as a regular Full-Time or Part-Time Employee, including an Employee who would be receiving such remuneration except for an Authorized Leave of Absence."  § 2.21, Legacy Plan, AR 341.  In turn, "Employer" means "Galileo International; effective as of April 1, 2008, Travelport International, L.L.C.; and effective as of January 1, 2010, Travelport, LP; and any successors thereto."  § 2.22, Legacy Plan, AR 342.  The Court refers to "Travelport" as the "Employer."

Plan] shall not exempt any Employee from the eligibility requirements" of the Legacy Plan itself.  § 3.05, Legacy Plan, AR 352.

The UAL Plan and the Galileo Plan imposed the same basic requirement for eligibility (and, thus, for plan participation) as those set forth in the Legacy Plan: an employee becomes eligible to participate in the plan after reaching the age of twenty-one and after completing one year of service.  See § 3.01, Galileo Plan, AR 22; see also § 2.1, UAL Plan, AR 214.  Likewise, the Covia Plan awarded service credit to plan participants so long as they were twenty-one and had completed one Year of Service.  See Amendment to § 4.4, Covia Plan, AR 128 (providing retroactive service credit to Employees for months of employment "after completing one Year of Service for periods of employment prior to age twenty-five . . ., but in [no] event for [service] prior [to] age twenty-one").

The Legacy Plan issued a Summary Plan Description (the "2009 SPD") that became effective on December 31, 2009.  See AR 542–90.  The 2009 SPD sets forth the Legacy Plan's participation requirements:  an individual was eligible to participate in the Legacy Plan if she "met the age and service requirements for the [Legacy] Plan, meaning . . . [she] had reached age [twenty-one], and . . . [she] had completed one Year of Service."  AR 547.  The 2009 SPD also includes provisions about "Benefit Service" from previous plans.  The 2009 SPD defines "Benefit

Service" as "[s]ervice that is used to determine [an individual's] accrued benefit under [her] plan.  Generally, Benefit Service is measured from [the individual's] Participation Date until [her] Freeze Date or termination of employment[,] whichever is earlier."  AR 577.  The 2009 SPD contains the following language: "If you were employed by United Airlines between the ages of [twenty-one and twenty-five], you will be credited with one month of Benefit Service for each month of employment with United Airlines that you completed between ages [twenty-one and twenty-five]."  AR 579.

### 2.    Calculation of Benefits

The nature of benefits awarded to a plan participant and the manner in which those benefits were determined differed by plan.  Below, the Court discusses the calculation of benefits under the Legacy Plan and under the Covia Plan in turn.

### a.    The Legacy Plan

The Legacy Plan calculates participants' benefits according to a set formula: "1.6% of [a Participant's] Final Average Compensation MULTIPLIED BY: Months of Benefit Service / [DIVIDED BY] 12."  § 6.02, Legacy Plan, AR 355. "Final Average Compensation" is defined as "[t]he highest monthly average of a Participant's Compensation attributable to the sixty . . . consecutive Months of Service occurring during the last one-hundred twenty . . . Months of Service of

employment with the Employer."  § 2.27, Legacy Plan, AR 342.  The definition of

a "Month of Service" in the Legacy Plan depends on the timeframe at issue.  The

Legacy Plan defines "Month of Service" on or after January 1, 1993, to mean the

following:

> each calendar month during which an Employee was a Participant in
> the Plan and was credited with at least one . . . Hour of Service for
> which [s]he is either directly or indirectly paid or entitled to payment
> by an Employer or . . . for the performance of duties.

§ 2.34(a)(i), Legacy Plan, AR 344.[5]  The Legacy Plan contains a different

definition of "Months of Service" for the period before this date:  "Service prior to

January 1, 1993, shall equal the Months of Service standing to the credit of the

Employee or Participant as of December 1, 1992 under the [Covia] Plan."  §

2.34(a)(ii), Legacy Plan, AR 344; see also § 2.11(b), Legacy Plan, AR 338

(providing that a participant in the Covia Plan will be credited with Benefit Service

"equal to the number of Months of Service for benefit accrual purposes that were

standing to [her] credit under the [Covia] Plan as of December 31, 1992").[6]  Thus,

---

[5] A "Month of Service" for this timeframe also includes "any period during which no
duties were performed by reason of vacation, holiday, illness, incapacity (including
disability), layoff, jury duty, military duty, or authorized leave of absence."  § 2.34(a)(i),
Legacy Plan, AR 344.

[6] The Galileo Plan also used this method to award Months of Service to participants in
the Covia Plan.  See § 2.11(b), Galileo Plan, AR 12 ("A Participant who was a participant
in the [Covia] Plan shall be credited with months of Benefit Service equal to the number

the Legacy Plan awards Months of Service *prior* to January 1, 1993, based on the number of months already accrued by a Covia Plan participant, instead of calculating Months of Service according to the number of calendar months during which an employee was a plan participant.

>           b.      *The Covia Plan*

While the Legacy Plan uses a set formula (based on Final Average Compensation and Months of Service) to calculate benefits, the Covia Plan awarded benefits in a different manner.  The first section of the Covia Plan explains that the plan's "purpose . . . is to pay a benefit that supplements the benefit eligible employees will receive from the [UAL] Plan by increasing their final average earnings, but not their years of participation, credited under the [UAL] Plan" and directs that the plan "should be construed consistently with that purpose."  § 1.1, Covia Plan, AR 139.  The Covia Plan later explains that a participant's accrued benefit "shall be determined based on [her] Final Earnings, [her] Years of Participation . . . and [her] Annual Social Security Benefits."  § 4.1, Covia Plan, AR 152.  The Covia Plan defines "Years of Participation," for the "purposes of calculating the benefits payable under the [Covia] Plan," as "the

---

of Months of Service for benefit accrual purposes that were standing to [her] credit under the [Covia] Plan as of December 31, 1992.").

number of Years of Participation (including fractions of a Year) credited to [a]

Participant under the [UAL] Plan."  § 4.4(a), Covia Plan, AR 156–57.

A brochure issued to participants on or about December 31, 1992, entitled

"Important Information About Your Pension Plan Benefits Statement" (the "Covia

Plan Brochure"), sets forth further details about benefits under the Covia Plan.  AR

914.  The Covia Plan Brochure includes the following language:

> Although you do not receive Pension Service credit for your months
> and years of service with Covia prior to January 1, 1993, you do
> receive a valuable benefit in recognition of that service:  If you were a
> participant in the "5%" Retirement Plan, you are now fully vested in
> your account balance from that plan—regardless of your length of
> service, as noted on your statement.  This service also counts toward
> eligibility and vesting under the Pension Plan.

AR 916.  An April 1999 brochure issued to participants in the Galileo Plan

conveyed a similar message (the "Galileo Plan Brochure").  AR 918–23.

According to the Galileo Plan Brochure, "[a]lthough you do not receive pension

benefit service with Galileo prior to January 1, 1993, you do receive a valuable

benefit in recognition of that service towards eligibility and vesting under the

[Galileo Plan]."  AR 919.  The Galileo Plan Brochure further explains that

> [i]f you were employed by Galileo International (Covia) from 1987 to
> 1992, you were a participant in the Covia "5% Retirement Plan."  . . .
> If you were a participant in the "5% Retirement Plan," service from
> 1987 to 1992 is counted towards vesting service as it relates to the
> [Galileo Plan], but not toward pension benefit service.

AR 923.[7]

## C.     The Role of the EBC

The EBC holds "discretionary authority to determine eligibility for Plan benefits and to construe and interpret the terms of the Plan, including the making of factual determinations."  § 17.01, Legacy Plan, AR 388; see also § 17.05, Legacy Plan, AR 389 (granting the EBC "sole discretion" for "[a]ll determinations and decisions regarding provisions of the Plan involving eligibility to participate in the Plan, eligibility for benefits under the Plan, and the amount and form of benefits payable under the Plan").  As such, a person or entity named by the EBC "will make all determinations as to the right of any person to a benefit."  § 17.12, Legacy Plan, AR 391.

To assist the EBC in its duties, the Legacy Plan obliges Travelport to "furnish the [EBC] such data and information as may be required."  § 17.04, Legacy Plan, AR 389.  Travelport's records concerning "an Employee's or Participant's period of employment, termination of employment . . ., leave of absence, reemployment and compensation will be conclusive on all persons, unless determined to be incorrect."  Id.  Additionally, "[p]articipants and other persons

_____

[7] As noted earlier, Plaintiff was employed by Covia from 1988 until 1992.  See supra section II.A.

entitled to benefits under the Plan must furnish the [EBC] with such evidence, data, or information as the [EBC] considers desirable to carry out the terms of the Plan." Id.

**D.      Plaintiff's Claim for Benefits, Appeal and EBC Determinations**

Plaintiff's employment ended on May 6, 1997; her expected retirement date was December 1, 2011.  AR 909; AR 593.  In 1999, Plaintiff asked the plan's then-sponsor (one of Travelport's predecessors) about early retirement.  AR 964.  On October 15, 1999, the sponsor provided Plaintiff with an administrative worksheet (the "1999 Administrative Worksheet") that showed the calculation of Plaintiff's monthly pension benefits.  AR 964–70.  The 1999 Administrative Worksheet showed that Plaintiff earned 26 months of Benefit Service for Pre-Age Twenty-Five Service and 187 months for UAL Service.  AR 967.  A similar correspondence dated October 12, 2001, provided Plaintiff with information about her benefits.  AR 948.  That letter included a participant worksheet (the "2001 Participant Worksheet") that, like the 1999 Administrative Worksheet, showed that Plaintiff received 26 months of Benefit Service for Pre-Age Twenty-Five Service and 187 months for UAL Service.  AR 952.  Plaintiff chose not to pursue early retirement and did not make a claim for benefits at that time.

In 2011, Plaintiff initiated contact with Travelport (by that time, the Legacy Plan's sponsor) about claiming her pension benefits under the Legacy Plan.  AR 593.  This led to ongoing communication from 2011 to 2015 between Plaintiff, her counsel and Travelport's representatives about the calculation of Plaintiff's pension benefits.  Plaintiff ultimately filed a claim with the EBC on August 8, 2015.  Pl.'s Claim Letter, AR 591–636.  The EBC denied Plaintiff's claim for benefits on December 7, 2015.  EBC Claim Letter, AR 829–34.  Plaintiff appealed the denial of her claim on April 5, 2016.  Pl.'s Appeal Letter, AR 832–66.  The EBC again denied her claim on August 2, 2016.  EBC Appeal Letter, AR 906–12.

As relevant here, Plaintiff claimed that her benefits were miscalculated because Travelport did not award Months of Service for the following periods of time:  (1) twelve months during the period of Plaintiff's employment with UAL before she turned twenty-five (the "Pre-Age Twenty-Five Period"); (2) twelve months during Plaintiff's employment with UAL (the "UAL Period"); and (3) fifty-four months representing Plaintiff's employment with Covia (the "Covia Period").  AR 616.  The Court will review the EBC's conclusions concerning each of these issues below.

### 1.    Pre-Age Twenty-Five Period

As to the Pre-Age Twenty-Five Period, Plaintiff argued that the first year of her employment should be included in the calculation of her Months of Service under the Legacy Plan and that she was entitled to twelve additional months.  See EBC Claim Letter, AR 832.  To support this argument, she relied on language from the 2009 SPD.[8]  Pl.'s Claim Letter, AR 618.  The EBC rejected Plaintiff's claim and concluded that the "calculation excluding [her] first year of service is correct." EBC Claim Letter, AR 832.

The EBC explained that Plaintiff's position was "taken without consideration of the eligibility provisions found throughout numerous controlling Plan documents" that "explicitly state that Plan participants must complete one . . . year of service prior to becoming eligible to participate in the Plan."  EBC Claim Letter, AR 829.  Specifically, the EBC cited Section 3.01 of the Legacy Plan, which requires employees to complete one year of service to become eligible for

---

[8] Plaintiff specifically pointed to the following language:  "If you were employed by United Airlines between the ages of [twenty-one and twenty-five], you will be credited with one month of Benefit Service for each month of employment with United Airlines that you completed between ages [twenty-one and twenty-five]."  2009 SPD, AR 579; see also Pl.'s Claim Letter, AR 618 (quoting the 2009 SPD).  Plaintiff's argument seems to be that this language removes the requirement "that former UAL employees between ages [twenty-one and twenty-five] had to complete one year of service before being credited with months of benefits service."  Pl.'s Claim Letter, AR 618 (capitalization altered).

participation and, further, confirms that an employee's participation in the UAL Plan or Covia Plan does not exempt her from the Legacy Plan's eligibility requirements.  EBC Claim Letter, AR 832.  The EBC further noted that the Covia Plan "similarly excluded the first year of service."  Id.  Finally, the EBC explained that the language in the Legacy Plan and the Covia Plan "governs" the Pre-Age Twenty-Five Period, "not the [2009] SPD."  Id.

The EBC upheld its determination on appeal, reiterating the eligibility requirements set forth in the Legacy Plan and the Covia Plan.  EBC Appeal Letter, AR 907.  The EBC also noted that the 2009 SPD clarifies that "participants must complete one year of service prior to becoming eligible to participate in the [Legacy] Plan."  Id.  The EBC could not locate any language under any plan stating "that the one year service exclusion based on the eligibility period does not apply to former UAL employees."  EBC Appeal Letter, AR 908.

### 2.    UAL Period

Plaintiff's claim about the UAL Period concerned the alleged omission of twelve Months of Service during her employment with UAL and, more particularly, the type of employment records that the EBC used to calculate the number of months to which she was entitled.  Plaintiff argued that she should have received 199 Months of Benefit Service, rather than 187, for the period of

November 16, 1971, through June 30, 1988.  EBC Claim Letter, AR 832–33.

Specifically, Plaintiff claimed that she was not provided with "source records"

documenting the "extent of [her] participation" during this period.  AR 833.  The

EBC rejected this claim, explaining that "ERISA claim procedures and disclosure

regulations simply do not mandate [that] plan administrators disclose to

participants source records of the type [Plaintiff] demand[ed]."  Id.  The EBC also

noted that Plaintiff had previously received benefit statements and at that time

could have raised any errors in the calculation of her benefits.  Id.

        In upholding this conclusion on appeal, the EBC provided additional detail

about the twelve-month disparity:  "Review of [Plaintiff's] personnel file produced

print-outs of [her] employment history from [her] date of hire through December

31, 1980.  These records showed that [she] took leaves of absence totaling [twelve]

months from [her] date of hire through 1980."  EBC Appeal Letter, AR 908.

Accordingly, the EBC relied on this personnel file to "tak[e] into account the

[twelve-month] leave of absence" when calculating Plaintiff's Months of Service.

Id.  Plaintiff again took issue with this personnel file and argued that the EBC was

obliged to produce "source materials" substantiating the conclusion that she took

twelve months of unauthorized leaves of absence.  AR 850.  The EBC reiterated on

appeal that ERISA does not require plan administrators to produce "source

documents from decades past" and instead requires "only the retention of documents that are sufficient to determine the benefits due or that become due to employees."  AR 908.

### 3. Covia Period

Finally, Plaintiff disputed the calculation of her service during the period of her employment with Covia, from July 1, 1988, through December 31, 1992.  EBC Claim Letter, AR 833.  Plaintiff contended that this period was "completely ignored" in the calculation of her Months of Service.[9]  Pl.'s Claim Letter, AR 625. The EBC did not agree.

On appeal, the EBC noted that the Legacy Plan "state[s] that participants of the [Covia Plan] are credited with months of benefit service equal to the number of months of credit that were 'standing to [her] credit' under the [Covia Plan] as of December 31, 1992."  EBC Appeal Letter, AR 909.  Citing Sections 1.1 and 4.1 of the Covia Plan,[10] the EBC explained that "these provisions show that there was no intention for a participant to earn periods of service credits during the Covia

---

[9] In the EBC's initial claim letter, the EBC focused on an issue concerning an offset of Plaintiff's benefits that was payable under an annuity rather than on her claim that this period was omitted from the calculation of her Months of Benefit Service.  See EBC Claim Letter, AR 833–34.  The offset issue is not presently before the Court and is therefore not discussed in any detail.

[10] The Court discussed these plan provisions in detail in section II.B.2.b, see supra.

Period."  Id.  The EBC also relied on language in the Covia Plan Brochure and the

Galileo Plan Brochure, which the Court discussed earlier, see supra section

II.B.2.b., "which explains that participants would not receive Pension credit for the

months and years of Service with Covia prior to January 1, 1993," EBC Appeal

Letter, AR 909.  The EBC therefore rejected Plaintiff's claim about the Covia

Period on appeal:  "The stated terms of the Covia Pension Plan, as well as the

[Covia Plan Brochure and Galileo Plan Brochure], show that it was communicated

to participants such as [Plaintiff] that, during the Covia Period, [Plaintiff was] not

entitled to receive pension service credit towards the calculation of [her] benefits."

EBC Appeal Letter, AR 909–10.  Plaintiff's claims thus failed on appeal, and this

lawsuit ensued.

## III.  LEGAL STANDARD

"ERISA itself provides no standard for courts reviewing the benefits

decisions of plan administrators or fiduciaries."  Blankenship v. Metro. Life Ins.

Co., 644 F.3d 1350, 1354 (11th Cir. 2011).  Instead, the standard of review "'is a

specially fashioned rule designed to carry out Congress's intent under ERISA.'"

Graham v. Life Ins. Co. of N. Am., 222 F. Supp. 3d 1129, 1136 (N.D. Ga. 2016)

(quoting Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 618 (6th Cir.

1998)).

As an initial matter, "[r]eview of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision." Blankenship, 644 F.3d at 1354; see also Graham, 222 F. Supp. 3d at 1136 ("ERISA benefits denial cases place the district court as more of 'an appellate tribunal than as a trial court.'" (quoting Curran v. Kemper Nat'l Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005))); Bauman ex rel. Sumner v. Publix Super Markets, Inc. Emp. Stock Ownership Plan, No. 3:15-CV-75, 2017 WL 5236148, at *5 (N.D. Ga. Mar. 17, 2017) ("[T]he Court conducts its review of the administrative record, taking into account the arguments presented by the parties in their briefs.").

The Eleventh Circuit has "established a multi-step framework to guide courts in reviewing an ERISA plan administrator's benefits decisions." Blankenship, 644 F.3d at 1354. Courts must apply the following six-step test:

(1)  Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)  If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)  If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)   If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)   If there is no conflict, then end the inquiry and affirm the decision.

(6)   If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan, 833 F.3d 1299, 1311–12 (11th Cir. 2016) (quoting Blankenship, 644 F.3d at 1355).  Thus, based on the standard above, this Court must assess whether Defendants' calculation of Plaintiff's benefits was "wrong" under the *de novo* standard before, as needed, continuing through the six-step inquiry.

## IV.   CONCLUSIONS OF LAW

The Court's Conclusions of Law are organized as follows:  (A) Whether Travelport Is a Proper Party and (B) Calculation of Benefits as to the (1) Pre-Age Twenty-Five Period, (2) UAL Period and (3) Covia Period.

## A.   Whether Travelport Is a Proper Party

The Court begins with the threshold issue of whether Travelport, one of two named defendants, is a proper party in this action.  Defendants argue that Travelport is an improper party for two reasons.  First, Plaintiff's "decision to name the Legacy Plan as a defendant provided her with a defendant that could and would pay any favorable judgment." [Doc. 53-1, p. 23].  Second, Travelport does

not control the payment of benefits under the Legacy Plan and thus "lacks a role in the relevant aspect of the administration of the Plan." Id. at 24.  Plaintiff responds only that Travelport is a properly named defendant because its employees "exercised decisional control" over her claim for benefits.  [Doc. 54, p. 20].

Under ERISA, "a money judgment against an employee benefit plan is only enforceable against the plan as an entity, unless liability against some other person is established." Rosen v. TRW, Inc., 979 F.2d 191, 192 (11th Cir, 1992); see also 29 U.S.C. § 1132(d)(2).  A plaintiff may establish liability against "some other person" with "proof that the person is a plan administrator and thus responsible for decisions regarding benefits." Rosen, 979 F.2d at 192.  "Proof of who is the plan administrator may come from the plan document," but such proof may also "come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document." Hamilton v. Allen-Bradley Co., 244 F.3d 819, 824 (11th Cir. 2001).  At bottom, the "key question" for establishing liability is whether the alleged administrator "had sufficient decisional control over the claim process," which is a necessarily fact-intensive inquiry.  Id.

The express terms of the Legacy Plan provide that Travelport serves as the Plan's administrator.  See § 17.01, Legacy Plan, AR 388.  Importantly, Travelport

23

is responsible for administering the Plan "*except* to the extent such responsibilities are delegated to the [EBC]." Id. (emphasis added).  The Legacy Plan, in turn, vests the EBC with the "sole discretion" to make "final and binding" decisions about "eligibility to participate in the Plan, eligibility for benefits under the Plan, and the amount and form of benefits payable under the Plan."  § 17.05, Legacy Plan, AR 389.  The Plan also delegates to the EBC the power "[t]o construe and interpret the Plan and to determine all questions arising under [it], including the power to determine the rights of eligibility of Employees or Participants . . . and their respective benefits," and "[t]o direct all payments of benefits under the Plan."  § 17.01(c), (e), Legacy Plan, AR 388.  These plan provisions make clear that the EBC is responsible for decisions regarding benefits.  As such, Travelport—which, although the Plan administrator in other respects, does not exercise decisional control over the award or denial of benefits—is not liable for any money judgment under ERISA and is therefore not a proper party.  See Griffin v. Suntrust Bank, Inc., 648 F. App'x 962, 965 (11th Cir. 2016) ("[A] court order requiring the payment of benefits under ERISA 'must issue against a party capable of providing the relief requested.'" (quoting Hunt v. Hawthorne Assocs., Inc., 119 F.3d 888, 908 (11th Cir. 1997))).

Plaintiff did not present any information to show that Travelport exercises control over benefit claims or over the EBC.  She argues only that because Travelport's employees communicated with Plaintiff about her benefits, Travelport necessarily exercised sufficient decisional control over her claim.  She asserts the following:

> Travelport's employees, Douglas Neu and Russell Ferrante, fielded (and fought) Plaintiff's requests for information regarding her Legacy Plan benefits for years, provided her with information regarding the calculation of the Final Average Compensation, held telephone calls with Plaintiff and her counsel regarding her benefit calculation, and participated in the communications from the [EBC] regarding the adverse benefit determination and appeals thereto.  Neither Neu nor Ferrante was a member of the EBC at the time they exercised this decision-making control over Plaintiff's claim for benefits.

[Doc. 54, p. 20] (citation omitted).  These facts alone, however, do not show the exercise of decision-making control over Plaintiff's claim to benefits.

The court in Henderson v. Transamerica Occidental Life Insurance Co., 120 F. Supp. 2d 1278 (M.D. Ala. 2000), addressed circumstances similar to those in this case and is instructive here.  In Henderson, it was undisputed that the employer, Ralston Purina, established, sponsored and administered the insurance plans at issue.  Id. at 1281.  Ralston Purina, however, contended that "it had no discretionary control over the outcome of Plaintiff's request for benefits" under the insurance plans and thus could not be liable under ERISA.  Id.

The court found no evidence that "Ralston Purina exerted any control whatsoever over the disposition of [p]laintiff's benefit claims," concluding instead that the evidence "establishe[d] only that Ralston Purina acted as a conduit between its employees and their insurers." Id.  The court observed that Ralston Purina provided forms to the plaintiff so that he could file his claim with the insurer and, at the request of the insurer, provided information about the plaintiff's employment.  Id. at 1282.  But "[w]hat Ralston Purina did not do was decide the merits of [p]laintiff's claims" under the insurance plans.  Id.  Such was the case here.  The evidence provided by Plaintiff shows that Travelport's employees communicated with Plaintiff about her benefits and later with the EBC, but as in Henderson, the employees did not decide the merits of her claim.  That role was held exclusively by the EBC.  Consequently, Plaintiff failed to establish individual liability as to Travelport.

Because the Legacy Plan is a defendant in this case and is capable of paying any judgment, the claim against Travelport is due to be dismissed.  See 29 U.S.C. § 1132(d)(2) ("Any money judgment . . . against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity . . . .").  Defendants' Cross-Motion for Judgment on the Administrative

Record is thus **GRANTED**, and Plaintiff's claim for benefits is **DISMISSED** as to Travelport only.[11]

## B.    Calculation of Benefits

### 1.    Pre-Age Twenty-Five Period

Upon a review of the administrative record, the Court finds that the EBC's decision not to award Plaintiff twelve Months of Benefit Service representing the first year of her employment was not *de novo* wrong.

When addressing a claim for benefits under ERISA, the Court "first look[s] to the plain and ordinary meaning of the policy terms to interpret the contract." Alexandra H., 833 F.3d at 1307; see also Hill v. Emp. Benefits Admin. Comm. of Mueller Grp. LLC, 971 F.3d 1321, 1326 (11th Cir. 2020) ("In conducting *de novo* review of a plan administrator's decision at step one, a court must look only at the text of the plan in light of the facts presented in the case."). The Court therefore begins its analysis with the terms of the Legacy Plan. An employee became eligible to participate in that plan once she "attained age [twenty-one]" and "completed one . . . Year of Service." § 3.01, Legacy Plan, AR 349. This language is unambiguous: Plaintiff became a plan participant *after* completing one

---

[11] The Court nonetheless refers to "Defendants" for the remainder of this Order.

Year of Service.[12]  The provisions of the Legacy Plan clearly show that an

employee became a participant upon reaching age twenty-one and upon

completing one Year of Service and—at that time, but not before—began to accrue

Months of Service.[13]  The presence in the Galileo Plan and the UAL Plan of this

same requirement for participation reinforce this conclusion, as does the Covia

Plan's express exclusion of any service credit for months of employment prior to

age twenty-one and prior to completing one year of service.

---

[12] That Plaintiff had attained the age of twenty-one is not in dispute.

[13] Plaintiff raised an argument for the first time at oral argument that the Court will
address briefly here.  Essentially, Plaintiff contended that the use of the conjunctive
phrase "Employee *or* Participant" in certain provisions of the Legacy Plan fundamentally
changes how those provisions should be interpreted.  Plaintiff argued, for example, that
Section 2.34(a)(ii) of the Legacy Plan should be construed as granting Plaintiff Months of
Service for every month of her *employment*, regardless of whether she was a plan
participant for those months.  See § 2.34(a)(ii), Legacy Plan, AR 344 ("Service prior to
January 1, 1993, shall equal the Months of Service standing to the credit of the Employee
*or* Participant as of December 31, 1992 under the [Covia] Plan . . . ." (emphasis added)).
As a threshold matter, this argument is undoubtedly waived; it was not referenced in any
of the briefs and was raised for the first time at oral argument.  See Holland v. Gee, 677
F.3d 1047, 1066 (11th Cir. 2012).  Even if it were not waived, the argument does not
change the Court's conclusion.  First, Plaintiff's position relies on the premise that there
is some distinction between eligibility to participate in the Plan, actual participation in the
Plan and accrual of Months of Service.  See [Doc. 68, p. 14].  Plaintiff cited neither plan
provisions nor case law to support this contention.  Second, contrary to Plaintiff's
position, the conjunctive phrase "Employee *or* Participant" merely conveys that Section
2.34(a)(ii) applies to an individual regardless of whether she was an Employee *or* a
Participant on December 31, 1992.  That phrase does not expand the Months of Service
available to an individual.  Instead, Section 2.34(a)(ii) simply incorporates and brings
forth the Months of Service that were already "standing to the credit" of an individual as
of December 31, 1992, whether she was an Employee or a Participant on that date.

The 2009 SPD does not change the outcome.  It is true that "where a plan participant or beneficiary relies on a provision in the SPD that conflicts with the plan, he or she may enforce the SPD over the terms of the plan." Heffner v. Blue Cross & Blue Shield of Ala., Inc., 443 F.3d 1330, 1341–42 (11th Cir. 2006). Accordingly, to enforce an SPD, a plan participant must show both the existence of a conflict between the terms of a plan and the terms of an SPD *and* that she relied on the SPD.  Branch v. G. Bernd Co., 955 F.2d 1574, 1579 (11th Cir. 1992) ("We reiterate our holding that a beneficiary must show reliance *on the terms of the summary*."); cf. Liberty Life Assurance Co. of Bos. v. Kennedy, 358 F.3d 1295, 1300 (11th Cir. 2004) (declining to "decide which document controls" where the terms of a life insurance plan and an SPD were "not irreconcilable").  Plaintiff has shown neither in this case.

First, the 2009 SPD does not conflict with the language in the Legacy Plan. To explain this conclusion, the Court will review relevant portions from the 2009 SPD.  First, far from conflicting with the terms of the Legacy Plan, the 2009 SPD actually reiterates the Plan's participation requirements:  an individual is eligible to participate in the Legacy Plan if she "met the age and service requirements for the [Legacy] Plan, meaning . . . [she] had reached age [twenty-one]" and "had completed one Year of Service."  AR 547.  Elsewhere, the 2009 SPD contains the

following language, on which Plaintiff's argument is premised: "If you were employed by United Airlines between the ages of [twenty-one and twenty-five], you will be credited with one month of Benefit Service for each month of employment with United Airlines that you completed between ages [twenty-one and twenty-five]." AR 579. And finally, the SPD defines "Benefit Service" as "[s]ervice that is used to determine [an individual's] accrued benefit under [her] plan," which is generally measured from an individual's participation date. AR 577. Essentially, then, the 2009 SPD defines "Benefit Service" as that which accrues once an individual commences participation in the Plan. As made clear by both the Legacy Plan and the 2009 SPD's own language, an individual begins participation once she reaches age twenty-one and completes one Year of Service. At that time, but not before, she begins to receive Benefit Service (i.e., begins to accrue Months of Service).

Second, even if the terms of the Legacy Plan conflicted with the 2009 SPD, Plaintiff would be required to show that she relied on the 2009 SPD to prevail on this ground. This, she failed to do. Plaintiff does not set forth any facts in her briefs showing reliance; she provides only conclusory statements. See, e.g., [Doc. 52, p. 19] ("Plaintiff reasonably relied upon the language of the SPD directly applicable to her as a former United Airlines employee."). Notably, too, the SPD

on which Plaintiff claims to have relied is from 2009—but Plaintiff's employment

ended in 1997.  It is difficult to see how Plaintiff could have relied on an SPD

issued over a decade after the end of her employment.  She claims in her response

brief that her decision not to "seek any further employment opportunities to bolster

her retirement benefits is evidence of her reliance."  [Doc. 54, p. 18].  This single

sentence is insufficient evidence of reliance.

The procedural history of this case bears mentioning here.  On appeal, the

Eleventh Circuit "hesitate[d] to affirm dismissal" of Plaintiff's claim about the Pre-

Age Twenty-Five Period because a full administrative record might show that

Plaintiff relied on documents *other* than the 2009 SPD.  Williamson v. Travelport,

LP, 953 F.3d 1278, 1292 (11th Cir. 2020); see id. at 1292–93 (explaining that

Plaintiff may have "relied on a UAL SPD with that language in 1968 when she

first began work" and "may have relied on it in accepting employment at UAL,

opting to participate in the UAL Plan, opting to participate in successor plans,

declining to participate in other plans, and so forth").  At bottom, the Eleventh

Circuit declined to dismiss this claim because "[i]t is plausible that other SPDs

included the same language [as that in the 2009 SPD] and that [Plaintiff] relied on

those SPDs, and that a certified administrative record could help resolve the

dispute."  Id. at 1293.  However, the Court now has before it a complete

administrative record, but Plaintiff has not shown any other SPDs on which she relied or any specific facts demonstrating reliance.  And as explained above, the Court finds that the clear language of the Legacy Plan forecloses Plaintiff's claim in the first instance.  Hoak v. Plan Adm'r of Plans of NCR Corp., 389 F. Supp. 3d 1234, 1275 (N.D. Ga. 2019) ("When plan documents unambiguously address the substantive rights of the parties at issue, the plan language controls." (quoting Meadows ex rel. Meadows v. Cagle's, Inc., 954 F.2d 686, 691 (11th Cir. 1992))). After this de novo review, the Court affirms the EBC's decision as to the Pre-Age Twenty-Five Period.

### 2.    UAL Period

After consideration of the administrative record, the Court concludes that the EBC was not de novo wrong by awarding Plaintiff 187 months, rather than 199, for the period of her employment with UAL.

The Administrative Record contains several benefit calculations worksheets that show that Plaintiff earned 187 Months of Service during the UAL Period.  See AR 999 (showing that Plaintiff was entitled to 187 months, or 15.583 years, of service for the UAL Period); see also AR 1002 (same); AR 1040 (same).  Under the terms of the Legacy Plan, records provided by Travelport, such as these documents, are "conclusive" unless "determined to be incorrect."  § 17.04, Legacy

Plan, AR 389.  The Administrative Record contains no indication that Plaintiff provided any documentation suggesting or proving that the records provided by Travelport were incorrect.  Therefore, under the terms of the Legacy Plan, the records showing that Plaintiff earned 187 Months of Service during the UAL Period are conclusive.

The Court will briefly address Plaintiff's arguments for why the EBC was in error.  First, she claims that the Administrative Record lacks evidentiary support for the decision to award her 187 Months of Service, rather than 199, for the UAL Period.  See [Doc. 52, pp. 20–21].  But that is not the case:  the Administrative Record contains Plaintiff's employee file, see AR 996–1079, and that file shows that she is entitled to 187 Months of Service for the UAL Period.

Second, Plaintiff contends that Defendants had the burden to justify "excluding" twelve Months of Service from the UAL Period and that they failed to meet this burden.  As a general principle, a plaintiff bringing a claim for benefits under 29 U.S.C. § 1132(a)(1)(B) "bears the burden of proving [her] entitlement to contractual benefits."  Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040 (11th Cir. 1998).  However, "if the insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage."  Id.  Plaintiff argues that the "exclusion" of benefit

service during the UAL Period falls under this burden-shifting rule and that, as a result, *Defendants* must prove that a policy exclusion prevents coverage (and that they failed to do so in this instance).  See [Doc. 52, p. 20].  The Court is not persuaded by this argument.  The vast majority, if not all, of cases applying Horton's burden-shifting rule do so where a policy expressly excludes coverage for a specific circumstance or upon the occurrence of a specific event.  See Horton, 141 F.3d at 1041 (life insurance policy with an exclusion for suicide); Garcon v. United Mut. of Omaha Ins. Co., 779 F. App'x 595, 600 (11th Cir. 2019) (policy for short-term disability benefits that expressly excluded coverage of workplace injuries for which the policyholder was entitled to worker's compensation); Horneland v. United of Omaha Ins. Co., 717 F. App'x 846, 853 (11th Cir. 2017) (long-term disability policy with an exclusion for pre-existing conditions); Prelutsky v. Greater Ga. Life Ins. Co., 692 F. App'x 969, 973 (11th Cir. 2017) (long-term disability policy with an exclusion for injuries sustained as a result of intoxication).  Plaintiff has not identified a provision in the Legacy Plan or any other plan that operates to "exclude" twelve months from the UAL Period.  Nor has Plaintiff identified a case applying Horton to circumstances like those in this case, where no specific policy exclusion is at issue.  As such, the burden does not shift to Defendants.  At bottom, Plaintiff simply did not earn Months of Service for

twelve months during the UAL Period.  On *de novo* review, the Court thus affirms

the EBC's decision to award Plaintiff 187 Months of Service for the UAL Period.

### 3.     Covia Period

Finally, the Court has reviewed the administrative record and determined

that the EBC's decision not to award Plaintiff fifty-four Months of Service, the

period of her participation in the Covia Plan, was not *de novo* wrong.

Once again, the Court begins its analysis with the terms of the operative

plan.  Hill v. Emp. Benefits Admin. Comm. of Mueller Grp. LLC, 971 F.3d 1321,

1327 (11th Cir. 2020) ("In interpreting plan documents, we look first to the text of

the plan.").  Plaintiff participated in the Covia Plan from approximately July 1,

1988, until December 31, 1992.  The Legacy Plan awarded Plaintiff Months of

Service for this period[14] in an amount "equal" to the "Months of Service standing

to [her] credit . . . as of December 31, 1992 under the [Covia] Plan."  § 2.34(a)(ii),

Legacy Plan, AR 344.  To determine the Months of Service standing to Plaintiff's

credit under the Covia Plan as of December 31, 1992, the Court must assess how

the Covia Plan calculated and awarded benefits.

---

[14] As a reminder, the Legacy Plan contains two different definitions for "Months of Service," depending on the timeframe at issue.  Plaintiff's participation in the Covia Plan occurred prior to January 1, 1993, and thus the Legacy Plan's definition for that time period controls.

The very first section of the Covia Plan informs participants that they would not accrue years of service under the plan:  "The purpose of this Plan is to pay a benefit that supplements the benefit eligible employees will receive from the [UAL] Plan by increasing their final average earnings, *but not their years of participation*, credited under the [UAL] Plan, and this Plan should be construed consistently with that purpose."  § 1.1, Covia Plan, AR 139 (emphasis added).  As explained earlier, see supra section II.B.2.b., benefits under the Covia Plan were determined according to a participant's Final Earnings, Social Security benefits and Years of Participation, see § 4.1, Covia Plan, AR 152.  The Covia Plan defined "Years of Participation" to mean "the number of Years of Participation (including fractions of a Year) credited to such Participant under the [UAL] Plan."  § 4.4(a), Covia Plan, AR 156–57.  Put simply, benefits under the Covia Plan were calculated according to a participant's Final Earnings, Social Security benefits and Years of Participation *credited under the UAL Plan*—rather than earned or accrued under the Covia Plan.  The definition of "Years of Participation," the formula for awarding benefits and the introductory language explaining the purpose of the Covia Plan show that participants did not earn Months of Service under that plan.

In addition to the terms of the Covia Plan itself, communications sent to plan participants conveyed in unambiguous language that participants did not earn

service credit for their participation in the Covia Plan.  The Covia Plan Brochure stated that "you do not receive Pension Service credit for your months and years of service with Covia prior to January 1, 1993."  AR 916.  The Galileo Plan Brochure similarly explained that "service from 1987 to 1992 is counted towards vesting service as it relates to the [Galileo Plan], *but not toward pension benefit service*."  AR 923 (emphasis added).  Of course, these brochures do not constitute binding plan language, but they reinforce the terms of the Covia Plan and show that the terms were conveyed clearly to plan participants.[15]

Having conducted a *de novo* review of the administrative record, the Court affirms the EBC's decision not to award fifty-four months in the calculation of Plaintiff's Months of Service.

## V.     CONCLUSION

Based on the foregoing, Plaintiff's Motion for Judgment on the Administrative Record [Doc. 52] is **DENIED**.  Defendants' Cross Motion for

---

[15] Plaintiff contends that the Legacy Plan lacks any express language subtracting the service she supposedly earned while participating in the Covia Plan.  This argument misunderstands the operation of the Covia Plan:  its express intent, stated in the very first section, was that participants would *not* earn service credit.  The Legacy Plan did not need to include language expressly subtracting or excluding service that Plaintiff never earned in the first instance.

Judgment on the Administrative Record [Doc. 53] is **GRANTED**.  The Clerk is

**DIRECTED** to close the case.

      **SO ORDERED** this 13th day of February, 2023.

 

J. P. BOULEE
United States District Judge